By the Court. Duer, J.
This is a bill for the foreclosiu’e of a mortgage, for securing the payment of 25,000 dollars, executed and delivered by the defendant, Henry Yates and his wife, in September, 1838, to The Horth American Trust and Banking Company, an association organized under the general banking law of this state. The consideration of the mortgage was the nominal amount, or par value, of two hundred and fifty shares in the capital stock of the company, for which the defendant, Yates, as an original associate, had subscribed; and the legality of the consideration, and consequently the original validity of the mortgage, is not impeached or denied. It is, however, contended, that the debt which the mortgage purports to secure, has been in effect extinguished by an actual payment of one third of the amount, and by a set-off exceeding the residue to which the mortgagor is said to be entitled, and which is composed of various sums of money, alleged to have been due to him, from the company, when, in consequence of its insolvency, a general receiver of its property and effects was appointed.
The title of the plaintiff to enforce the payment in this suit, of whatever amount may appear to be due upon the mortgage, is just as unquestionable, as the validity of the mortgage. This title is derived from two sources, one or the other of which must be valid. In the early part of 1840, the bond and *143 mortgage of the defendant, together with - a large amount of other securities, were assigned by the company to Lewis Curtis, Richard M. Blatchford, and John L. Graham, in trust, to secure the payment of certain sterling bonds to be issued by the company ; and if this assignment were void, all the securities which it embraced, upon the dissolution of the company, became the property of the general receiver. The trustees, however, and the general receiver, in compliance with certain orders of the late coiu-t of chancery, have united in an assignment of all these secm’ities to the plaintiff, who, by virtue of another order of the same court, was appointed a special receiver, with authority to collect the amount, and enforce the payment of securities placed in his hands. These facts have all been established by the requisite proofs, and are not contested.
In an ordinary case, it would be needless to inquire whether the real title of the plaintiff is derived from the trustees, or the general receiver; but owing to the peculiar nature of the defence in this suit, this inquiry is, in our judgment, certainly proper, and perhaps necessary. If the assignment to the trustees were valid, and the defendant is chargeable with actual or constructive notice of its existence, prior to the transactions, upon which his defence is founded, the whole of his defence will be excluded, and a decree such as the plaintiff asks, must of necessity follow. And upon this supposition, it will be unnecessary, and, as we think, inexpedient to consider, whether as against a title, derived solely from the general receiver, the defence could be sustained. The questions which the suit, if founded solely upon the title of the general receiver, would involve, may and probably will arise in other cases; and from the nature of these quesions, we are unwilling to commit ourselves by any intimation of opinion, in relation to any of them, until it shall become our duty to decide them.
The only questions, therefore, that we propose to consider, and in relation to which any explanation of our views will be necessary, are, first, whether the assignment to the trustees, Curtis, Blatchford, and Graham, was operative and effectual; and, second, whether the defendant is to be charged with notice of that *144 assignment, at any time before all or any of the transactions upon which he founds his defence.
The validity of the assignment is denied, upon the single ground, that, contrary to the provisions of the revised statutes, it was unauthorized by any previous resolution of the board of directors of the company. (1 R. S. eh. 18, Tit. 2, sec. 8, page 591.) In considering this objection, we shall assume that those provisions of the revised statutes which relate to moneyed corporations are applicable, so far as without inconsistency they may be applied to associations organized under the general banking law; but it is proper to add, that the position we assume is regarded by us as far more questionable than it seems to have been considered in the cases, reported and unreported, to which we were referred upon the argument. Whether these banking associations are corporations at all, in the sense of the revised statutes, and whether the general banking law does not include all the provisions, restrictions, and liabilities, to which the legislature meant that the associations organized under the law, their directors and officers, shoidd be subject, are questions upon which we forbear to express any opinion, but which we hold ourselves at liberty to examine, and shall feel it our duty to examine with the care and attention which their importance demands, if they shall arise in any case in which it will be necessary to decide them. We think that no decision of controlling and paramount authority has hitherto been made in relation to either of them, unless that of the court of errors in Warner v. Beers may be so construed.
Conceding, however, that the views of the defendant’s counsel upon these doubtful questions are correct, we are still of opinion that the objection upon which they relied cannot be sustained, first, because the assignment to the trustees was in fact authorized in the mode that the statute requires; and, second, because the want of such an authority would not, in this case, be construed to render void the assignment.
It cannot be doubted that a banking association under the general law, may, by its articles of association and by-laws, divide the business it is authorized to transact into several *145 distinct departments, and constitute-a separate board of directors for each department; or which is the same thing, may intrust to a separate committee of the directors the exclusive charge of each department, clothing that committee with all the powers of a board, in relation to the business which its department embraces ; and it is exactly this course that the original associates of the ¡North American Trust and Banking Company actually followed in organizing the company. ' By the second section, article 10, in the articles of association, the directors as a board are empowered to make such by-laws, rules, and regulations for the management of the business of the company and the government of themselves, their officers, and agents, as they may think expedient, not inconsistent with law and the articles of association.
It is not denied that the by-laws which were produced and given in evidence were duly made in pursuance of this authority, and we are clearly of opinion that they are neither inconsistent with law nor with the articles of association. The first section in the first article of these.by-laws, declares that the business of the company shall be conducted under two divisions. The first division to embrace the business relating 'to bonds, mortgages, and other securities; and the second, the business of discount- and deposit, that is, the banking business, strictly so called. It is plain that these divisions were meant to cover the whole business of the company, and consequently that the words “ the business,” in the first division, must be construed to mean all business relating to the subjects there mentioned, and therefore, that they include the transfer and assignment, as well as the taking of mortgages and other securities. The second section in the same article establishes two departments, corresponding with the preceding divisions, and places them under the immediate supervision and direction of two distinct committees, and then, in connexion with the fourth section in the same article, gives to the committee of the first department, denominated the committee of investments and finance, the exclusive charge of all the business belonging to the first general division of the ' business of the company; not, it is true, making this delegation of power in expréss words, but in language that was evidently *146 meant to be thus understood, since otherwise a portion of the business of the company would remain, for which, as not falling under either department, no provision whatever is made—contrary to the manifest purpose of dividing and distributing the whole. Any doubts, however, that might still remain upon the question, whether it was intended that the committee of investment and finance should have power to direct the transfer of securities, are effectually removed, by the clear and explicit language in the third section of the second article of the by-laws, which declares that the president shall have power to assign, as well as to cancel and discharge “ all mortgages, judgments, and other instruments, held by him in trust for the company, with the approbation and sanction of the committee of investments and finances,” thus mating the sanction of the committee equivalent to a resolution of the board of directors; or, more properly, constituting the committee such a board, in relation to this, as well as all other business which they are authorized to supervise and direct.
The construction that we have now given to the articles of association and by-laws of this company, is by no means novel. It was adopted and acted upon by the supreme court in this district, sitting as a court of equity, in the case of David Leavitt, the General Receiver, v. Richard M. Blatchford and others.(a) Tn that case, an assignment of certain securities of the company, made by the president, which had no other prior sanction than a resolution of the committee of investments and finance, was held to be valid, and the decision was made upon the express ground, that, in the division of all the business of the company, made by its by-laws, all the general powers of the directors over the finances, (meaning undoubtedly exclusive of the funds employed in banting), were conferred upon and might be exercised by this committee. Upon this ground, it was held that this committee had not only the power by its separate action to borrow money, but to secure the repayment of the moneys borrowed, by directing an assignment of securities in trust for the lenders; which is *147 exactly the transaction upon which the title of the plaintiff in this case, as derived from the trustees, is founded.
Nor is this the only authority to which we may appeal, although alone it would he sufficient to justify, if not control, our decision. In the case of the Farmers’ Loan and Trust Company v. Wm. Blake and wife, Chancellor Walworth, in affirming the decree of the vice chancellor of the fourth circuit, expresses very clearly his opinion, that an assignment of a bond and mortgage, made by the president of the St. Lawrence Bank, an association under the general law, was valid, upon the ground that it sufficiently appeared from the evidence, that it had been made with the knowledge and approbation of a majority of the finance committee; and that by the by-laws of the bank, the sanction of this committee was alone necessary to authorize the act. The by-law of this bank is set forth in the opinion of the Vice-Chancellor Willard, and it corresponds exactly in its terms with those of the third section in the second article of the by-laws which we have read.
If then a resolution of the committee of investments and finance, must be deemed a resolution of the board of directors, within the meaning of the statutes, and such is our decision, the objection that the assignment to the trustees, of the bond and mortgage of the defendant, was an unauthorized act, and therefore invalid, falls to the ground, for that such a resolution was actually passed, has not been denied. It was adopted, as appears from the book of minutes produced in evidence, on the 30th April, 1840. ' It creates a new trust for 500,000 dollars, called the first half million trust, by authorizing an issue of the bonds of the company, payable in London, to the amount of 500,000 dollars, in the form previously adopted in a trust for one million of dollars, to be secured in a similar manner by a pledge of bonds and mortgages ; and for the purpose of securing the payment of the bonds, so to be issued, it directs the officers of the company, to select bonds and mortgages upon property in this state, to the amount of 600,000 dollars, and authorizes the president to transfer the same to Messrs. Blatchford, Curtis, and Graham, the trustees named in the former trust. The assignment and trust deed, produced and read upon the hearing,, are *148 regarded by us as evidence of the execution of the powers and • authority which this resolution confers, since it is from this resolution, that the act of the officers of the company in selecting the bonds and mortgages to be pledged for the payment of the bonds of the company, and that of the president in transferring by assignment to the trustees, the securities thus selected, which include the bond and mortgage of the defendant, derive their validity. It may be, that the necessary papers had been previously executed; but until this resolution was passed, they had not, nor were they designed to have, any operation or effect. We are satisfied that, until then, there was no actual transfer to the trustees, but that the change of title and possession followed and were a consequence of this resolution.
, It is not necessary, however, to place our determination of the question we have considered solely or at all upon the grounds that have been stated; for, admitting that a resolution of the entire board of directors was necessary to give validity and effect to the assignment, by the president, a resolution, that we hold to be not only sufficient, but conclusive proof of the knowledge and assent of the board, was adopted, and has been given in evidence.
It was adopted on the 15th June, 1840, and its terms are so material, that they require to be fully stated.
“ Resolved, That the finance committee be authorized to transfer to Messrs. R. M. Blatchford, Lewis Curtis, and John L. Graham, in trust, bonds and mortgages, not exceeding $1,800,000, as a security for the bonds of the company, payable in three years, for not exceeding 331,500 pounds sterling, with 6 per cent, interest, payable in London, and that the said committee be authorized to add any amount of secmities that may be required to render the said bonds negotiable.”
That this resolution directly refers to the million, and half million trusts that had been previously created by the finance committee, and that the meaning is, that 1,200,000 dollars of the bonds and mortgages, which the committee are directed to transfer, should be held by the trustees, under the first trust, and the residue under the second, cannot be doubted, and has not been denied; but that the true import and effect of the reso *149 lution may be understood, there are other facts to which it is necessary to advert. Although each of these trusts as created was expressed in dollars, yet the bonds of the company which they were intended to secure were sterling, and amounted in the aggregate, those under the million trust to £225,000, and those under the half million to £112,500, making together the £337,500 mentioned in the resolution. These bonds were payable in London, and the intention was, that they should be transmitted to the correspondents and agents of the company in that city, Messrs. Palmer, Mackillop, Dent & Co., for negotiation or sale. It is certain, however, that none had been negotiated, nor probably transmitted, at the time of the passage of this resolution. This fact is not only apparent on the face of the resolution, since otherwise an issue of other bonds to the full amount that was originally meant to be secured, would not have been directed, but was established by other evidence. Hence, although when this resolution was passed, the assignment and trust deeds relative to each trust had been executed, and the bonds and mortgages allotted to each probably delivered to the trustees, yet the entire subject was still under the absolute control of the company and its directors. The bonds and mortgages, although in the hands of the trustees, were the property of the company alone. The whole beneficial interest and the whole power of disposition were vested in them, and until other ¡persons should acquire an interest as holders for value of the bonds of the company, the trustees were bound to obey implicitly, the resolutions and instructions of the board of directors. That board, so long as things remained in this condition, had an absolute right to revoke and annul the trusts, and reclaim all the securities that they embraced, and this right, of necessity, comprehended that of changing and modifying the trusts, in their discretion; while the relation to the company in which the trustees then stood, imposed upon them the duty of holding the securities in their hands upon any new terms or conditions that the directors might choose to declare. Hence the resolution of the 15th June was adopted by the board, in the exercise of an authority that they unquestionably possessed, and its necessary legal effect was to alter and modify the original trusts in two *150 important particulars; first, by substituting bonds of the company, payable in three years, as the objects of the trusts, in the place of bonds payable in seven years, to which the trust deeds as executed alone referred; and second, by setting aside in effect the selection of bonds and mortgages that had been made by the officers of the company, and committing the whole subject of the choice and appropriation of the securities that each trust should embrace, to the discretion of the finance committee. We are satisfied that this resolution has been fully executed, and that it is only by a reference to its terms that the powers of the trastees, and the nature of their title, can be ascertained and defined.
■It has been proved, that the only bonds of the company that have been issued, and the payment of which the trusts before created could operate to secure, in conformity to the terms of the resolution, were payable in three years from their date; and although it does not appear that the finance committee, in the exercise of their discretion, made any alteration in the securities previously assigned, or any addition to their number, this is only a proof that its members were satisfied with the selection of bonds and mortgages already made, and therefore ratified and confirmed it; but we are clearly of opinion, that the title of the trustees to the bonds and mortgages they were thus permitted to retain, is just as certainly to be referred to the discretion and choice of the finance committee, acting under the resolution of the 15th June, as it must have been to substituted bonds and mortgages, had those first assigned been wholly withdrawn. It is the assent of the finance committee, acting under the resolution, that alone gave effect to the prior assignment.
It is evident that the facts which have now been stated, constitute a full reply .to the objection that was strenuously insisted on by the counsel for the defendant, namely, that the resolution of the 15th June, being subsequent in date to the assignment, could not be relied on as evidence of a compliance with the terms of the statute, which expressly require a “ previous resolution.” This resolution was previous to any assignment that either was, or was intended to be, operative and effectual. It was previous to any assignment that, under the state of facts *151 that then existed, could operate, or was designed to operate, as a transfer of the property of the company. Until this resolution was passed, the assignment was nominal, formal, and lifeless. It derived, from this resolution alone, its vitality and force; and upon this resolution alone, the title of the trustees, and of the plaintiff as their representative, is actually founded.
Were the circumstances of this case, however, such as they were supposed to be by the defendant’s counsel; were it true that the resolution of the 15th June must be regarded as subsequent to the assignment; yet, thus construed, it would be amply sufficient to repel the objection founded upon the statute, since upon the narrowest construction it is impossible to deny that the resolution recognises and sanctions the trust previously created; and this sanction is all that the statute in. its just construction requires. We are fully convinced that the sound and most reasonable maxim of the common law, “ RatihabiUo priori mmdato rngm/pa/rai/u/r^ that a subsequent ratification is equivalent to a prior authority, (i. e. gives the same validity to an act that upon the ground of a want of authority is sought to be impeached,) a maxim borrowed from the Roman law, and now an element in the jurisprudence of every civilized nation, is just as applicable to this case as to any other to which it has ever been applied. We believe this maxim to be universal in its application, since we have been unable to discover that there is or can be any exception from the reasons upon which it is founded. It is a mistake to suppose that the word “ previous,” in the statute, creates such an exception. In every case to which the maxim is or can be applied, a previous authority is necessary to give an immediate validity to the act that is alleged to be confirmed ; the very words of the maxim imply that this necessity exists, and whether it arise from a rule of the common law, or a provision in a statute, must be immaterial. By the rule of the common law, a previous mandate or order is just as necessary to make the act of a person assuming to be an agent, binding upon the principal, as by the terms of this statute, a previous resolution of the board of directors to make the act of the president binding upon the corporation; and we know no reason why it is not just as competent to the directors to adopt *152 and ratify the unauthorized act of the president, as to the principal, that of his agent. The rule of law and of good sense that gives the power of confirmation, is as applicable to the one case as to the other. It is just as reasonable in the one case as in ithe other, that the act thus confirmed, although previously void, should no longer be subject to impeachment.
Hor is it necessary to rest' our opinion upon the reasons that have been stated. It has been repeatedly decided, that when a prior authority is rendered necessary by a statutory provision, the want of such an authority may be supplied, and the act impeached be rendered valid, by proof of its adoption by the person by whom it might have been authorized. An act of parliament, which is still in force in England, (28 Geo. HI. ch. 56.,) declares, that where an insurance is made by an agent, the name of the principal, or of the person who has received the order to insure, must be inserted in the policy; and it is admitted, as the plain and necessary import of the words of the statute, .that where the policy is in the name of an agent, the absence of a previous order to insure, received by him, renders the contract inoperative and void.
There is a single case, in which Lord Ellenborough doubted whether the words of the statute are not so express and imperative, as to exclude the evidence, when no previous order is shown, of a subsequent adoption of the policy, (Bell v. Jansen, 1 M. & S. 201;) but the doubts of his lordship do not appear to have been shared by his learned brethren, and the law is settled by many successive decisions, that the adoption by the principal of an insurance made by a voluntary agent, supplies the want of a previous order to insure, and renders the contract valid in its origin. (Wolff v. Hardcastle, 1 Bos. & Pull. 316; Sterling v. Vaughan, 11 East 619; Hagedorn v. Oliverson, 1 M. & S. 485; Routh v. Thompson, 12 East 274; Lucena v. Crawford, 2 New Rep. 269.) The terms of our statute are not more plain and positive than those of the English act of parliament, and if the construction given to the latter is not unjust or unreasonable, we are justified in following it.
It is not, however, necessary to say that a resolution of a board of directors, ratifying an assignment made by the president *153 without authority, has any retro-active force. It is sufficient to say, that the assignment is valid, from the time that the sanction of the board has thus been given to it; and we are quite certain that in saying this, although we may not follow the words of the statute in their literal sense, we fully satisfy their meaning and policy.
We have deemed it expedient to reply fully to the objections we have been considering, in order that we might explain our views as to the true construction of a very important statutory provision ; but were there no evidence in this case of a previous or subsequent resolution of the board of directors, sanctioning the act of the president, it would still be necessary to hold, according to our understanding of the facts and the law, that his assignment to the trustees, of the bond and mortgage of the defendant, was valid and effectual, from the time that the bonds of the company, which the assignment was meant to secure, came into the hands of holders, for a valuable consideration and without notice. We think that it appears clearly, from the evidence, that Messrs. Palmer, Macldllop, Dent & Co., became such holders, and as such became entitled to the protection of the statute, as embraced within the exception, which declares that no conveyance, assignment, or transfer, is to be construed as void, “ in the hands of a purchaser for a valuable consideration and without notice.” It will not be supposed that the words “ in the hands,” must be literally construed, so as to exclude the possession of a trustee or agent; nor that the word “ purchaser” is to be understood, in its limited popular sense, as applying only to a person who derives his title from an-actual sale. Every person who, for any consideration that the law judges to be valuable, has acquired directly or indirectly, a legal or equitable title, or interest, by an assignment or transfer from a moneyed corporation, is to be deemed a purchaser, within the meaning of the statute; and within this definition every assignee of a bond and mortgage, whether the assignment is made to him directly or to a trustee for his benefit and security, and whether it is made absolutely or as a collateral security, is plainly included. Hence the holders for value of the sterling bonds of the company, which the half million trust was created to secure, as they *154 acquired an immediate beneficial interest, in all the securities that had been assigned in trust for the payment of those bonds, became, in effect, the assignees and purchasers of every bond and mortgage that the assignment embraced. To deny these positions, is in effect to say that there can be no purchaser for a valuable consideration where a trust intervenes. The trustee is not such a pm-chaser, because from him no consideration proceeds, nor the cestui que trust, because to him no such title is given as the law requires.
It appears from the testimony of Mr. Murray, who acted as the agent of the company in London in 1840-41, that none of the bonds of the company belonging to the half million trust, were ever sold in market; but that, during the summer and autumn of 1840, they were from time to time transferred to Palmer, Mackillop, Dent & Co., as a portion of their security for a very large debt antecedently owing to them from the company. When they consented to accept these bonds, they gave up to Mr. Murray for the benefit of the company, other securities, principally state stocks, at least of equal value, which were then in their hands ; and it is needless to refer to the decisions to show, that by the surrender of these securities, they became the purchasers of the bonds for a valuable consideration. It is not to be doubted, that they became so just as certainly and effectually, as if the whole sum for which the bonds were given, had been advanced by them in cash when they received them. By the same act, they became the purchasers of the bonds and mortgages, included in the half million trust, held by the trustees; and from that time, every one of these mortgages was, in judgment of law, in their hands.
It is equally certain that they became such purchasers without notice, that is, without notice of any fact by which the validity of their title could be affected. So far from believing or suspecting that the statute had been violated, they were solemnly assured, and doubtless believed, that its provisions had been fully complied with. The recital in the trust deed, a counterpart of which was in their possession, contains the assurance to which we refer; and had they not thoroughly believed this recital to be true, there is no hazard in saying they would never *155 have consented to accept the bonds; they would never have parted with the state stocks, had a suspicion of its falsity entered their minds.
As the imputation of actual notice is thus effectually disproved, it remains only to consider whether upon any grounds Palmer, Mackillop, Dent & Co. are chargeable with notice by construction of law, that is, whether the facts of the case suggest any principle upon which the doctrine of constructive notice—a very reasonable doctrine when properly understood—can be justly applied to them. It has been frequently said, and in the recent case of Johnson v. Bush, (3 Barbour’s Chan. Rep. 201) the argument was pressed by the defendant’s counsel with much ingenuity and force, that as the statute forbids any transfer of the property and effects, exceeding a limited value, of a moneyed corporation, not authorized by a previous resolution of the board of directors, every purchaser from such a corporation is bound to ascertain whether the title which he receives is sanctioned by the provisions of the law, and if he omit to inquire, and the fact prove to be otherwise, is chargeable with notice. He is bound to know, and is presumed to know, that a resolution of the board is necessary, and is therefore, at his peril, bound to know whether it was actually passed. The argument is specious, and but for the exception which the statute contains, would be conclusive. But for this exception, the duty to inquire would, in every case, attach upon a purchaser, and his omission to inquire would charge him, in every case, with a knowledge of the facts that an inquiry would have disclosed. But we cannot listen to an argument that, if admitted to prevail, would reduce the exception in the statute to a dead letter, and render the promise it holds forth to purchasers, a delusion and a mockery. If the duty to inquire exist in any case, it must in all; and in all, the omission to inquire must be followed by the same consequences, and hence there is no possible case to which the exception, in favor of purchasers without notice, would be found to apply. That there may be purchasers without notice, the words of the exception necessarily imply; the argument would prove that there can be none. We believe that the words of the statute have a meaning that must be followed, and therefore reject an argument that *156 robs them of all possible significance. We are not to be understood as meaning to say, that circumstances may not exist that will impose the duty of inquiry upon a purchaser from a moneyed corporation, and operate, when he neglects to inquire, as a constructive notice; but it is quite certain, that the mere fact that he is a purchaser, is not constructive notice, and that, as a general rule, in order to charge him, actual notice must be proved. (a)
It may possibly be thought that there is another ground upon which the imputation of notice to Palmer, Mackillop, Dent & Co. may be legally rested. It may be said, that the trustees were their agents, and that the rule of law is positive, and without excejDtion, that notice to an agent is notice to his principal. We are very far from thinking that notice to trustees selected and appointed by the Company, could operate as notice to the innocent purchasers of the bonds; but this is a question that we refuse to consider, since we are satisfied that the trustees are no more chargeable with notice, than the purchasers whom they represented. Hot only is there no evidence of the fact, but its admission would convict them of a very gross fraud, in becoming parties to a trust deed, containing a recital, which they knew to be false, and which could only have been meant to deceive those for whom they consented to act, and whose rights and interests they solemnly agreed to protect. Hone other than the clearest and most incontrovertible proof would justify us in saying that such a fraud was committed or meditated; and we should do violence to our own convictions, if we uttered a word by which the imputation might seem to be countenanced. We reject it utterly; there is no more reason for doubting the perfect good faith of the trustees, than that of the purchasers. If the purchasers were deceived and mistaken, so were the trustees.
We have said all, perhaps more than all, that was necessary to be said upon the questions we have considered. Having *157 shown that the assignment to the trustees was authorized or sanctioned by the board of directors, or if not so authorized or sanctioned, was rendered valid by subsequent facts; the next inquiry is, whether there is such evidence that the defendant-had notice of the assignment, as must preclude us from admitting, in whole or in part, the defence upon which he has relied. The rule of law, which is indeed familiar and elementary, is not disputed; that the assignee of a debt, from the time that the assignment is known to the debtor, is the creditor to whom alone the debt must be satisfied, so that his right to enforce its payment, can never be affected by any subsequent transaction between the debtor and his original creditor. In respect to the assignee, every such transaction is “ res inter alios actaP In the present case, it has been distinctly and very properly admitted, that if the assignment is valid, the defendant’s certain knowledge of its existence in March, 1841, must exclude the larger portion of the credits to which he has claimed to be entitled. Upon this supposition, the controversy is limited to the single sum of 7,500 dollars, which has been treated as a loan, or, more -properly, as the aggregate of several loans made by the defendant to the company, in the months of January and February, 1841. The next, in order of time of the credits that are claimed, is the sum of 8,325 dollars, the value, at seventy-five per cent., of one hundred and eleven shares in the capital stock of the company, which it is alleged that the defendant transferred, and the company agreed to accept, as a payment of that amount of the capital sum secured by his mortgage; and the date of this payment is the 1st March, 1841. His right to be credited by the company with the two remaining sums of 3000 and 10,000 dollars, if it in fact exists, it is clear, from the evidence, was acquired subsequently to the agreement in relation to the shares of stock, and probably not sooner than in May, 1841. The agreement between him and the company, in relation to the transfer of the stock, and its acceptance as a payment, was produced - and read in evidence, signed by the president of the company and by the defendant. It refers expressly to the assignment and trust deed, and recites that the bond and mortgage of the defendant, together with others, had *158 been previously assigned to Blatchford, Curtis & Graham, in trust for the holders of the bonds of the company, and as -a pledge to the holders for the payment of those bonds, and that the trustees were willing to receive the shares of stock at the rate agreed upon, in payment of one third of the principal sum due upon the bond and mortgage of the defendant, provided the holders of the bonds of the company should approve thereof in wilting.
During the hearing, it was for a time insisted that the written approval of the bond-holders had been obtained; but in the result, it was proved to our entire satisfaction, that it had been deliberately withheld. Although the refusal of the bondholders, Pahner, Maekillop, Dent & Co., to consent to the proposed arrangement, rendered the agreement as to them inoperative and void, it could not impair the positive evidence which it affords of the defendant’s knowledge and admission of their rights ; and hence not only the payment to which their assent was refused, but the credits which the defendant has claimed, arising from subsequent facts, must of necessity be rejected.
The only question, therefore, is, whether the defendant is to be charged with notice of. the assignment of his bond and mortgage, at any time prior to the month of January, 1841, so as to exclude a set off of the sums which it is said that he advanced to the company in that and the succeeding month. This inquiry will not long detain us. We shall not say that there is conclusive proof of the actual knowledge of the defendant ; but we feel no difficulty or doubt in saying, that the evidence raises a presumption of his knowledge, that, in a court of equity, he could never be allowed to contradict. The fact may possibly be otherwise, but upon the evidence, we are bound to presume that he was himself a party to the transfer of his bond and mortgage to the trustees, and that the trustees derived their title, if not from his individual act, certainly from an act in which he co-operated. The resolution of the board of the 15th June, 1840, furnishes the evidence to which we refer, and all that we have now said is a necessary consequence of the construction that we have already given to that resolution. The defendant was present as a director, at the meeting of the board *159 at which it was adopted, and was then chairman of the finance committee, npon which the resolution imposed the duty of selecting and transferring the bonds and mortgages, or other securities, which the million and half million trusts were respectively meant to include. The duty thus imposed upon him, and which, by his assent to the resolution, he consented to assume, we must presume that he discharged. He must, therefore, have examined with care, for such was plainly his duty, all the bonds and mortgages then in the hands of the trustees, for the purpose of determining whether others should be added or substituted, or the trustees be permitted to retain them for the purposes for which they were originally assigned; he must, therefore, have ascertained that his own bond and mortgage was in the number of those then held by the trustees ; and must either have given his own consent to their retaining it, or must have known that by the act of the committee they were permitted to do so. Hor is this all. Had it been admitted and proved that the defendant never acted under the resolution of the 15th June, and had no personal knowledge of the action of the committee of which he was chairman, his voluntary ignorance—an ignorance arising from his violation or neglect of a certain known duty—would furnish no excuse and constitute no defence. He was bound to make the inquiry, that, in the absence of contrary proof, we have presumed him to have made; and in all cases where the duty to inquire exists, the law charges the party upon whom it rests, with a knowledge of all the facts that the inquiry, if made, would have revealed to him. It is upon this principle that the doctrine of constructive notice, both in law and equity, mainly rests, and we doubt whether a case has occurred, in which the principle has been applied with more manifest reason, or more conclusive force.
Could we even reject from our consideration the resolution of the 15th June, there are other grounds upon which, with entire satisfaction to our own minds, we should place our decision. We doubt whether a director of a moneyed corporation or banking association, should ever be permitted to deny his own knowledge of the lawful transactions of the company, if by such denial the rights of a third person, an innocent dealer with the com *160 pany, may be prejudiced or affected. We doubt whether he should be permitted to deny his knowledge of any transaction which, in the discharge of his duties as a trustee of the stockholders and creditors, and a guardian of their property and interests, he was bound to know. But the defendant was not merely a director of this banking association. He was, as already stated, chairman of the finance committee, and to this committee the investment, management, and care of the capital of the company were specially, intrusted. That committee was bound to know in what manner and in what securities the capital was invested, and to permit none of the securities in which it was invested to be withdrawn, unless replaced by other securities of equivalent value. Hor can we understand why the duties thus imposed upon the committee, ought not to be considered as attaching personally upon each of its members. It is true, that a'committee cannot act as such, until its members are convened, but the knowledge necessary to its action, each member is bound to possess.
The bond and mortgage of the defendant were an investment of a portion of the capital of the company; but they ceased to be such when they were withdrawn from the charge of the finance committee, and assigned to the trustees; nor could the finance committee, without a violation of duty, have permitted this withdrawal and transfer, unless other securities, which they deemed to be of equal value, were then substituted. Hence, as we must presume that the finance committee performed its duty, the facts of withdrawal, transfer, and substitution must have been known to its members, and as no ground for a distinction can be stated, it is to each of them that this knowledge must be imputed. Could we admit that the presumption of notice to the defendant, arising from these facts, might be repelled, no evidence to repel it has been given. It is true, that the answer contains a denial of notice, but the answer is not under oath, nor is the denial responsive to any allegation in the bill. It is not, therefore, evidence in itself, and it is wholly unsupported by proof. We can lay no stress upon the circumstance that the defendant continued to pay the interest upon his mortgage to the officers of the company, at its banking-house, *161 during a considerable period after the mortgage had been assigned to the trustees, for, by an express provision in the trust-deed, the company was entitled to receive the interest upon all the mortgages assigned, until default was made in the payment of its own bonds. A payment of interest, consistent with the assignment, is of no weight, as repelling the presumption of the defendant’s knowledge of the fact.
We give no opinion upon the question, whether the defence that has been set up, or any portion of it, could have been allowed to prevail, had this suit been brought by the general receiver, or could only have been maintained upon his title; hut as the case stands, and for the reasons that have been given, the defence as a whole, and in all its parts, must he overruled.
The plaintiff is entitled to the usual decree, with costs.

 Now reported in 5 Barb. S. C. E. 9, and 3 Comst. 19.

 See Cary 1 v. McElrath, S. P. in the other branch of the court; the second case post.