ISAIAH TOWNSEND BURDEN, Appellant, *v.* JAMES A. BURDEN and
Others, Respondents.

*Corporations — construction of an agreement designed to prevent, by the creation of a*
*corporation, the control of property by either of two persons owning together all of*
*the property — when the corporation is bound by it — increase in the number of*
*trustees — restraints on the power of alienation of stock, not favored — when corpo-*
*rations, having a common director, may purchase the one from the other — a by-law*
*giving great powers to a general manager cannot be attacked unless the powers given*
*exceed the powers of the corporation — an unauthorized acceptance of property by a*
*corporation cannot be attacked except by the State — when fancy farming should*
*not be carried on by a corporation organized under chapter 40 of the Laws of 1848.*

In an equitable action it appeared that the plaintiff and his brother, the defend-
ant James A. Burden, had for several years prior to June 30, 1881, been
engaged as equal partners in the manufacture of iron in the city of Troy,
where they owned a large plant and also two valuable mansion houses known
as Woodside, occupied by them as residences, and a farm of about 170 acres of
land. Differences of opinion as to the management of the business arose
between the brothers, and on June 30, 1881, an agreement was entered into
between them and the defendant John L. Arts, preparatory to the formation of
a corporation, which was as follows, viz.: "For value received, it is agreed
between the undersigned, who are the sole associates of the Burden Iron Com-
pany, that the stock in said company shall be taken, owned and held as fol-
lows, to wit: James A. Burden shall take, own and hold 1,000 shares; I. Town-
send Burden shall take, own and hold 998 shares, and John L. Arts shall take,
own and hold 2 shares. The said James A. Burden agrees to and with the
said I. Townsend Burden that if he shall, at any time, sell or assign 998 shares
of said stock, then and in such case he will, without any considerations for
the same, transfer the other two shares of his said stock to the said I. Town-
send Burden, his executors, administrators or assigns. All the profits arising
from the business of the said corporation shall be divided equally between the
said James A. Burden and I. Townsend Burden. The said Arts agrees for
himself, his executors and administrators, that in case of a sale of any or all
of his said stock that said James A. Burden and I. Townsend Burden shall be
entitled to the same severally, share and share alike, at and for its par value;
and in case either of them shall refuse in writing to make such purchase, then
the other shall be entitled to his half, or the whole thereof, as he may elect. It
is further agreed that said Arts shall not receive any dividends, income or profit
from the said corporation or its business, but that in place thereof he shall have
and receive a salary to be fixed by the said board of trustees of said
corporation."

Upon the same day James A. Burden and I. Townsend Burden and John L.
Arts executed and filed a certificate under the General Manufacturing Act

incorporating the Burden Iron Company (to which all the partnership property of James A. Burden and I. Townsend Burden was transferred by them), with a capital stock of $2,000,000, divided into 2,000 shares of $1,000 each, which were distributed in the manner provided for in the agreement. The number of trustees of the corporation was fixed at three, and the three persons above named were constituted the trustees for the first year. They continued to be the sole stockholders and trustees until about November 22, 1884, when the defendant James A. Burden transferred one of his shares of stock to each of his brothers-in-law, the defendants William Irvin and Richard Irvin, Jr. On November 26, 1884, James A. Burden and John L. Arts executed and filed a certificate increasing the number of trustees from three to five, by the addition of William Irvin and Richard Irvin, Jr., but this certificate was not made at a meeting of the board of trustees, of which the members of the board had notice.

*Held*, that the agreement above set forth was binding on the corporation, and should be read in connection with the certificate of incorporation;

That the additional trustees who were appointed by a certificate (not made at a meeting of the board of trustees of which its members had notice) were lawfully appointed ;

That the increase in the number of the trustees was not in contravention of the agreement made between the plaintiff James A. Burden and John L. Arts on the 30th of June, 1881 ;

That James A. Burden had a legal right under the agreement to make the sale of one share of his stock to each of the defendants William Irvin and Richard Irvin, Jr. ;

That the transfers of one share to William Irvin and of one share to Richard Irvin, Jr., although without consideration, were good, except as against creditors, and vested in the donees an absolute title to the stock ;

That the right of alienation of corporate stock is never to be restrained except by clear and explicit language ;

That the provision of the agreement requiring all profits to be divided equally between James A. Burden and I. Townsend Burden was only intended to secure to them equally all the profits so long as their holdings of stock remained the same, and did not affect the right of James A. Burden to dispose of his stock.

It further appeared that James A. Burden was a large stockholder not only of the Burden Iron Company, but also a large stockholder and one of the directors of the Hudson River Ore and Iron Company, and that the Burden Iron Company for a long period made large purchases of ore of the Hudson River Ore and Iron Company for use in the manufacture of pig iron, but it did not appear that these purchases were made in bad faith, or that they were injurious to the stockholders of the Burden Iron Company.

*Held*, that the doctrine, which declared voidable all contracts made between two corporations having one or more common directors, could not be invoked by the plaintiff in order to attack the purchase by the Burden Iron Company of

the ore of the Hudson River Ore and Iron Company, in both of which corporations James A. Burden was a stockholder;

That the right to disaffirm a transaction between two corporations, having a common director, was one which inhered in the corporations or their directors, and could not be asserted by a person who was merely a stockholder, except in a case where the acts of the directors were fraudulent and injurious to the corporate property.

It further appeared that the board of trustees of the Burden Iron Company, in 1885, passed a by-law by which powers of great scope were given to John L. Arts as general manager of the Burden Iron Company.

*Held*, that the validity of the by-law, which invested John L. Arts with great powers as general manager of the Burden Iron Company, could not be assailed merely because its wisdom or expediency might be doubtful;

That inasmuch as the General Manufacturing Act permitted the trustees of a company incorporated under it " to make such prudential by-laws as they shall deem proper for the management and disposition of the stock and business affairs of such company, not inconsistent with the laws of this State, and prescribing the duties of officers, artificers and servants that may be employed," the only restriction imposed upon such a by-law was, that it must not be inconsistent with the laws of this State;

That the board of trustees might delegate to its agent power to perform any act which the board itself could lawfully perform.

*Semble*, that, assuming the by-law to be void, an action could not be maintained to annul it, unless its enforcement was threatened and would result in irreparable injury to the plaintiff.

Among other assets of the partnership, contributed by it to the corporation, were the so-called Woodside houses, grounds and an adjoining farm, as well as certain stocks in other corporations, and the plaintiff asked that these be withdrawn from the Burden Iron Company and be distributed between the plaintiff and the defendant James H. Burden. Upon the farm property there had been conducted what was called a " fancy farm," which was supported from the assets of the corporation, and large expenditures upon its account had been made by the Burden Iron Company, against the protest of the plaintiff.

*Held*, that as the Woodside houses, grounds, and the adjoining farm, together with the stocks of certain other corporations, had been actually contributed by the partners to the Burden Iron Company, a court of equity had no power, at the instance of a stockholder, to take the property from the corporate assets and divide it among the stockholders, even in a case where the property was such as the corporation was not authorized to acquire and hold;

That a conveyance to a corporation of property which, by its charter, it was incompetent to take, was not void, but voidable, and could be attacked by the State alone;

That in this case a further objection to the relief asked for existed in the principle that a court of equity will not afford relief to a stockholder against the unauthorized acts of a corporation, to which he has consented and in which he has participated;

That the plaintiff was, however, entitled to an injunction restraining the Burden Iron Company from continuing the business of "fancy farming," as that was not a business which could be carried on legally by the corporation against the objections of a stockholder.

APPEAL by the plaintiff, Isaiah Townsend Burden, from a judgment of the Supreme Court in favor of the defendants, entered in the office of the clerk of the county of Rensselaer on the 17th day of November, 1893, upon the decision of the court rendered after a trial at the Rensselaer Special Term, except the following provisions thereof :

That the said preliminary or promoters' agreement executed by the plaintiff and defendants Burden and Arts June 30, 1881, is binding and effective upon the parties thereto individually and as stockholders and trustees of the Burden Iron Company.

That the said promoters' agreement is binding and effective on the Burden Iron Company, and has been since the formation of said company.

That said preliminary or promoters' contract lawfully limits, regulates and controls the respective interests and rights of the plaintiff and the defendants Burden and Arts as incorporators of and stockholders and trustees in the Burden Iron Company.

That said promoters' contract controls the ownership and holding of the stock of the Burden Iron Company by the plaintiff and the defendants Burden and Arts.

That the plaintiff is lawfully entitled to one-half of all the profits arising from the business of the Burden Iron Company, and he has been so entitled, at all times, since June 30, 1881.

That the defendant John L. Arts is not, and since June 30, 1881, has not been, entitled to any income, dividend or profit upon any of the capital stock of the Burden Iron Company.

That at the time of the commencement of this action the Burden Iron Company was unlawfully maintaining said Woodside houses and grounds and expending its funds thereon.

That at the time of the commencement of this action the Burden Iron Company was unlawfully carrying on and maintaining said Woodside farms and expending its funds for that purpose.

That the defendants should be and are hereby enjoined from expending the funds of the Burden Iron Company in "fancy farm-

## 164 BURDEN v. BURDEN.

ing," as set forth and complained of in paragraph 17 of the amended complaint in this action.

*E. Countryman*, for the appellant.

*R. A. Parmenter* and *Esek Cowen*, for the respondents.

Judgment affirmed, with costs, on opinion in the court below.

All concurred.

The following is the opinion of the court below :

EDWARDS, J. :

The careful examination by the court of the very voluminous testimony in this case, required for the purpose of making its rulings on 400 propositions of fact and of law which have been submitted to it by counsel, has involved so large an expenditure of time that it must confine any further consideration of the questions presented to some of those which are deemed to be of the most importance, and to which many of those passed upon are only subsidiary.

A part of the relief sought is to have the certificate of November 26, 1884, increasing the number of the trustees of the Burden Iron Company from three to five, adjudged to be invalid, and to restrain the additional trustees from exercising any of the functions of their office. I apprehend that the true solution of this question depends upon the construction to be given to the promoters' agreement, which was executed simultaneously with the certificate of incorporation of the Burden Iron Company. A brief history of the facts preceding and inducing this agreement and incorporation may render more intelligible some of the controverted questions. For several years prior to June 30, 1881, the plaintiff and his brother, the defendant James A. Burden, had been engaged, as equal partners, in the manufacture of iron in the city of Troy, and owned a large and valuable property for the purposes of their business, besides two valuable mansion houses, known as Woodside, and occupied by them as residences, a farm of about 170 acres and a large number of shares of stock in various corporations. Differences of opinion as to the management of the business arose from time to time between the brothers, which they, unfortunately, regarded as irreconcilable.

In June, 1881, this uncontrolled feeling culminated in a determi-

nation on the part of James to dissolve the co-partnership, and such purpose was communicated, through counsel, to the plaintiff.

To avoid an enforced dissolution, negotiations between them were instituted for the formation of a corporation, not only for the purpose of allaying the existing strife, but also in case of its continuance to preclude the disastrous results which were possible under the co-partnership. These negotiations resulted in the assent of the plaintiff to the terms and conditions persistently insisted on by James; but, notwithstanding the fact that the plaintiff's submission to the terms exacted was reluctant, the evidence clearly shows that it was with his full knowledge and appreciation of the possible consequences to himself. These terms were, in brief, that the entire partnership property should be transferred to a corporation to be organized, should be capitalized at $2,000,000, and that the stock should be distributed among the two brothers and the defendant John L. Arts, and should be subject to the provisions contained in the following so-called promoters' agreement, which was executed by the two brothers and Arts on June 30, 1881:

"For value received, it is agreed between the undersigned, who are · the sole associates of the Burden Iron Company, that the stock of said company shall be taken, owned and held as follows, to wit:

"James A. Burden shall take, own and hold 1,000 shares; I. Townsend Burden shall take, own and hold 998 shares, and John L. Arts shall take, own and hold 2 shares.

"The said James A. Burden agrees to and with the said I. Townsend Burden, that if he shall, at any time, sell or assign 998 shares of his said stock, then and in such case he will, without any consideration for the same, transfer the other two shares of his said stock to the said I. Townsend Burden, his executors, administrators or assigns. All the profits arising from the business of the said corporation shall be divided equally between the said James A. Burden and I. Townsend Burden. The said Arts agrees for himself, his executors and administrators, that in case of a sale of any or all of his said stock that said James A. Burden and I. Townsend Burden shall be entitled to the same severally, share and share alike, at and for its par value; and in case either of them shall refuse in writing to make such purchase then the other shall be entitled to his half, or the whole thereof, as he may elect. It is further agreed that said

Arts shall not receive any dividends, income or profit from the said corporation, or its business, but that in place thereof he shall have and receive a salary to be fixed by the said board of trustees of said corporation."

On the same day James A. and I. Townsend Burden and John L. Arts, who executed the foregoing agreement, duly executed, acknowledged and filed a certificate, in the form required by statute, whereby the Burden Iron Company was incorporated under the General Manufacturing Act of 1848. This certificate set forth that the signers had associated as a manufacturing corporation to continue for the period of fifty years; that the corporate name is the Burden Iron Company, the amount of capital stock $2,000,000, divided into 2,000 shares of $1,000 each; that the number of trustees is three; that the names of the trustees who will manage the affairs for the first year are James A. Burden, I. Townsend Burden and John L. Arts, and the operations of the corporation are to be carried on in the city of Troy.

Thereupon all the partnership property of James A. and I. Townsend Burden was transferred by them to the corporation, and it issued its $2,000,000 of stock therefor to the said promoters and incorporators in the proportions provided for in the promoters' agreement, and they continued to be the sole stockholders and trustees until about November 22, 1884, when the defendant James A. Burden transferred one of his shares of stock to each of his brothers-in-law, the defendants William Irvin and Richard Irvin, Jr.

On November 26, 1884, the defendants Burden and Arts, two of the three trustees, under the statute providing for an increase of the number of trustees, executed and filed a certificate increasing the number from three to five, by the addition of the said William Irvin and Richard Irvin, Jr.

The plaintiff contends that this increase should be adjudged to be invalid, and that the additional trustees should be enjoined from exercising any powers as trustees of the corporation. On the motion made by the plaintiff for a temporary injunction, at a Special Term held by Mr. Justice PECKHAM, the only ground on which the increase of the number of trustees was claimed to be illegal was that the certificate was not made at a meeting of the board of trustees of which the members had notice. The learned justice held that the

statute providing for an increase of the number of trustees is complied with if the certificate is signed and acknowledged by a majority of the existing trustees without any meeting of the board of which the members have notice. While the plaintiff does not abandon the ground taken by him at Special Term, he now bases his claim on the further ground that the increase is in contradiction of the promoters' agreement, which, he maintains, is binding on the corporation. I shall, of course, follow the opinion of Judge PECKHAM and hold that a meeting of the board, on notice to the members, was unnecessary, and shall consider only the other ground now urged by the learned counsel. While a preliminary agreement binds the individuals who make it, it is not necessarily binding on the corporation which it calls into existence; but if such agreement contains nothing in violation of a statute or against public policy, it may become the contract of the corporation by adoption. Here the promoters and the incorporators were the same persons, were the only stockholders and trustees, and so continued for more than three years; the stock was issued and distributed and the dividends were made in accordance with the provisions of the agreement, which was one that might lawfully be made. Under these circumstances I think it cannot be disputed that the agreement is binding on the corporation, and should be read and construed in connection with the certificate.

The question then becomes one of interpretation. The contention of the plaintiff is that under the agreement James was prohibited from transferring the two shares of stock to William Irvin and Richard Irvin, Jr., who took it with this infirmity, and, therefore, were ineligible as trustees. He maintains that it was contemplated and intended by the provisions of the agreement that James could not sell a part of his stock to outside parties unless he sold at one time 998 shares; but that he must hold his 1,000 shares until he desired to retire from the business, when he must sell at one time 998 shares to other parties and the remaining 2 shares to the plaintiff. Is this the proper construction of the agreement? Undoubtedly the instrument must be so construed as to effectuate the intention of the parties, but such intention must be ascertained from the language employed, and when this is ambiguous extrinsic testimony may be resorted to as an aid to interpretation. It should

also be borne in mind that the right of alienation is such a necessary incident of ownership that no restraint can be imposed upon it except in language clear and explicit.

The counsel for the plaintiff maintains that their theory derives support from the words, in the second clause of the agreement, "who are the sole associates of the Burden Iron Company." But I think these words have no doubtful significance. They clearly, although superfluously, state a fact. The parties were "the sole associates of the Burden Iron Company," but to say that it was an agreement that they should continue to be "the sole associates," would be not only an unnatural construction, but one in conflict with the subsequent provisions of the agreement. The agreement then provides for the manner in which the stock shall be issued and distributed, and says that "James A. Burden shall take, own and hold one thousand shares." I do not see how the word "hold," as here used, can reasonably be understood to be a restraint upon his disposition of the stock. That the word was here intended to have its ordinary legal import is evidenced by the subsequent clauses providing for the manner in which his stock might be disposed of. Furthermore, precisely the same words are employed in respect to the shares to be issued to the plaintiff and to the defendant Arts, and the agreement is silent as to any right of the plaintiff to sell, while it expressly provides for the manner in which Arts may dispose of his shares. The words "take, own and hold" are here, obviously, used synonymously. They only mean that the stock shall be issued to the two brothers and to Arts in the proportions therein provided, and are not intended as a restraint upon the power of alienation. The plaintiff's counsel base their contention very largely on the next clause in the agreement, which reads as follows : "The said James A. Burden agrees to and with the said I. Townsend Burden, that if he shall, at any time, sell or assign nine hundred and ninety-eight shares of his said stock, then and in such case he will, without any consideration for the same, transfer the other two shares of his said stock to the said I. Townsend Burden, his executors, administrators or assigns."

The plaintiff emphasizes the words " at any time," and maintains that this clause prohibited James from selling any part of his stock unless he sold at one time 998 shares ; or, in other words, that he

could not sell the 998 shares to outside parties in different lots at different times. I do not think the clause is fairly susceptible of such a construction. It is an unreasonable one.

According to this theory, here was a man owning one-half of the partnership property, to be vested with the ownership of one-half of the stock which represented property worth over $2,000,000 and which probably constituted the bulk of his property, agreeing not to dispose of any of his holdings unless he found a purchaser to take the whole. Furthermore, what was to become of the corporation with only two trustees, instead of at least three, as required by statute, at any time when Arts should become dissatisfied with his salary, and elect to sell his two shares to the plaintiff and to James, if the plaintiff should not choose to sell any of his shares, and James had not the power to do so, to an outside person to make him eligible as a trustee? Such an emergency might arise at any time after the formation of the corporation. It is very evident that if the intention was to prohibit James from selling his stock unless he sold it all at one time, it would have been expressed in very explicit language, and we would not have been left to spell out such intent from the words "at any time." I think the reasonable interpretation of this provision is, not that James shall not dispose of less than 998 shares "at any time," but that "at any time" when James shall have disposed of 998 shares he shall transfer the remaining two shares to Townsend. I think the purpose of this clause was to provide against a majority interest being created against Townsend in case James should desire to retire from the business. It was to give Townsend, in that event, the same advantage of holding half of the stock that James then possessed. The conclusion which I have reached not only gives to the language of the agreement its natural import, but is, I think, more in consonance with the facts and circumstances which led up to the agreement; and, while I do not deem it material, it appears to be more in accord with the plaintiff's understanding, as expressed in his letters to James of June 25, 1881, and November 6, 1882, the former six days before and the latter sixteen months after the formation of the corporation. In the former letter, urging that a corporation be organized, he says:

" Under a corporation you would sell your stock in small lots more readily, and probably for more money, than you could your half interest in the firm," and in the latter he says, " Who would buy any of your stock or mine, at any price, if they knew the company was carrying on these fancy farms ? " I am aware that the remaining provision of the agreement, that " all the profits arising from the business of the said corporation shall be divided equally between the said James A. and I. Townsend Burden," literally construed, is not entirely in harmony with the view I have taken as to the power of James to sell to outsiders a part of his 998 shares. When the agreement and certificate of incorporation were made I think neither of the brothers had any intention of selling any of his shares, and this provision was designed to secure to them, equally, all the profits so long as their holdings of stock remained the same. The provision applied to Townsend as well as to James, and it is not claimed that Townsend was prohibited from selling any of his stock. The brothers equally owned the property transferred, and for which 1,000 shares were issued to James, 998 to Townsend and 2 to Arts. Arts was to have no dividends on his shares, but a salary in lieu of them. It was but equitable, therefore, that the profits or dividends should be equally divided between the brothers so long as the situation remained unchanged, and this is, I think, what the parties understood to be the meaning of this somewhat doubtful provision. I am of opinion, therefore, that the transfers by James to William and Richard Irvin, Jr., were legal, and the increase of trustees is valid. The transfers of the two shares to the Irvins were without consideration, but, except as against creditors, a completed gift of stock vests the title in the donee as absolutely as does a purchase.

Another question in the case arises out of the purchase by the Burden Iron Company of the ore of the Hudson River Ore and Iron Company, for use in the manufacture of pig iron. Of the one and a half million of dollars of stock of the last-named corporation, James owns about $400,000, Arts $22,000 and the plaintiff none.

James is also one of the directors. In April, 1883, the Burden Iron Company began to buy this ore to mix with other ores in the production of pig iron in its blast furnaces, and the proportion of

such ore in the mixtures used has increased from five to fifty per cent. It is claimed by the plaintiff that the defendants Burden and Arts, for the purpose of furthering their interests as stockholders in the Hudson River Ore and Iron Company, have persisted, against the protests of the plaintiff, in buying the ore of that company to the detriment of the plaintiff and of the Burden Iron Company, and that the defendants should be permanently enjoined from the further purchase or use of such ore. A vast amount of testimony has been taken as to the relative value and productiveness of this ore in the manufacture of pig iron, and as to the alleged wrongful purpose of Burden and Arts in its purchase; and, after a careful examination, I have reached the conclusion that such ore was purchased and used in the exercise of their best judgment, without bad faith and without any pecuniary injury to the plaintiff as a stockholder in the Burden Iron Company. But the plaintiff contends that irrespective of any actual fraud in the purchase, he is entitled to the relief sought for the reason that James A. Burden is a director in both corporations, and that such purchases are, therefore, within the condemnation of the law.

He invokes the settled rule of law which declares voidable all contracts made between two corporations having one or more common directors. It is familiar doctrine that a contract made by an agent or trustee is voidable, at the election of the principal or person represented, in all cases where the fiduciary has any personal interest in the contract. The law does not permit one to act in the dual character of principal and agent, and when one assumes such a character it declares the transaction invalid, at the election of the person represented, without regard to the question whether it was fair or otherwise. This principle of agency applies not only to a contract between a director and the corporation which he represents, but also to contracts between two corporations having common directors, and this notwithstanding the fact that a majority of the directors of each corporation, exclusive of the common directors, voted for the contract. A trustee represents the corporation, and he cannot have two principals with conflicting interests. There can be no divided allegiance. (*Munson* v. *S., G. & C. R. R. Co.*, 103 N. Y. 58; *Metropolitan El. Ry. Co.* v. *Manhattan El. Ry. Co.*, 14 Abb. N. C. 251.) I think there can be no doubt that the law would

set aside or refuse to enforce, at the instance of either of these corporations, an executory contract between them for the sale of ore, on the sole ground of the two corporations having a common director. But will the law, on that ground, interfere at the instance of a stockholder? On principle, as well as authority, I think not. All the authorities hold that such a contract is *not void,* but is *voidable* only, at the election of the principal. The director holds a fiduciary relation to the corporation, and with the corporation rests the election to disaffirm. If the right to disaffirm rests with a stockholder, then, however small his holdings may be, he can nullify the contract however beneficial it may be to the corporation, and however subversive may be his conduct of the will and interests of a majority of the stockholders. Stockholders act through directors who represent the corporation. If the majority stockholders deem the contract unwise, and desire to disaffirm, they may elect a board of trustees who will execute their wishes; and, if they deem it otherwise, there is no reason why a single stockholder, or the minority stockholders, should be permitted to subvert their wishes.

In *Wallace* v. *Long Island Railroad Company* (12 Hun, 460) the plaintiffs, who were stockholders in the defendant corporation, which had taken a lease of two other roads, some of the directors of the defendant being also directors of the leased roads, sought to enjoin the carrying out of the lease. The court, by GILBERT, J., says: " I cannot say that the directors of the Long Island Railroad Company have abused the power mentioned, or that they fraudulently entered into the leases in question. They may have erred in judgment, but the court has no power to control the lawful exercise of the discretion vested in them as officers of the corporation. I see no reason for imputing to them bad faith or fraud.

" That being so, I am of opinion that a stockholder in that company is not entitled to have the leases avoided in opposition to the wishes of the parties to them. The directors are, no doubt, in one sense, trustees of the stockholder, but primarily they are the trustees of the corporation. If the corporation, acting with the approval of the holders of the major part of the stock thereof, prefer to abide by the leases, they cannot be avoided on the complaint of a minority of the stockholders against the will of the corporate body so manifested; and, in absence of evidence that the

holders of the major part of the stock disapprove the acts of the directors, their approval thereof must be presumed. In other words, the leases in question, although *infra vires*, may be voidable at the election of the corporation. But the plaintiffs are not entitled to make such election in behalf of the corporation."

The rule that persons acting in a fiduciary capacity shall not, directly or indirectly make any profit by means of such acts, or be interested in contracts made by their principals, undoubtedly applies to directors of corporations. It is a valuable principle and ought not to be impaired by any subtle or refined distinctions. Still, the mere fact that the same persons were directors of the corporation which made the lease and of that which took it is not of itself sufficient to avoid the contract at the instance of one or more stockholders against the will of the corporation. That fact alone might entitle either corporation to avoid the lease, but I apprehend it does not give the right to a stockholder. In the cases cited on behalf of the plaintiff, and in all the cases I have met with, where contracts have been avoided on that ground, the relief was sought or assented to by the " corporation." There is a class of cases, to which those cited by the plaintiff's counsel belong, where the acts of the directors are fraudulent and an injury to the corporate property, in which it is held that an action may be maintained and an injunction awarded at the instance of an aggrieved stockholder. But this case does not belong to that class. The distinction between the two classes of cases is observed in *MacNaughton* v. *Osgood* (41 Hun, 109).

There the action was brought by a stockholder of the defendant corporation to restrain the payment of salaries which the three trustees had voted to themselves as officers of the corporation. The court held that the contract was not void, but voidable only at the election of the corporation; that the plaintiff as a stockholder could not maintain the action without showing dishonesty on the part of the directors and an injury to the corporate estate; that it was not sufficient for him to show the fiduciary relations of the directors and that they had adopted the resolutions in which they were personally interested, as it was not clear from the simple fact that the directors voted to themselves salaries and received them that the corporation had been injured. At the close of the opinion LANDON, J., says: " There is a plain distinction between a case in which the corpora-

tion may, at its own option, avoid such a contract, and a case in which the corporation *from the fact that it is despoiled and in the hands* of its spoilers, ought to be adjudged to avoid it."

The plaintiff has assailed the validity of by-law No. 11, adopted at a meeting of the board of trustees of the Burden Iron Company on February 27, 1885. His counsel contend that it is unreasonable, in excess of the corporate power and void. The court is asked to adjudge it to be illegal and to enjoin the defendants from acting under it. Assuming the by-law to be void, I have very grave doubts whether the plaintiff, on that ground, can maintain the action. I know of no authority which permits one to bring an action to annul a by-law on the ground of its alleged invalidity. It is only where an attempt is made to enforce it to his detriment that the question of its validity can properly be raised for adjudication. Neither can he invoke equitable relief unless there is reason to apprehend some irreparable injury, which I think the plaintiff has failed to show in this case. But the conclusion at which I have arrived in respect to the validity of the by-laws renders unnecessary any discussion of that question. Section 7 of chapter 40 of the Laws of 1848, under which act the Burden Iron Company was incorporated, provides as follows: "The trustees of such company shall have power to make such prudential by-laws as they shall deem proper for the management and disposition of the stock and business affairs of such company, not inconsistent with the laws of this State, and prescribing the duties of officers, artificers and servants that may be employed." This statute has wisely confided to "*the trustees*" of the corporation power to make such by-laws for the management of the business affairs and prescribing the duties of officers as "*they* shall deem proper." The only restriction that the section imposes is that the by-laws be "not inconsistent with the laws of this State,' and I do not think that the court can impose any further limitations on the power of the trustees. Whatever may have been the common-law doctrine in respect to the power of courts over by-laws enacted by corporations, as one of their incidental powers, I cannot conceive how, under this statute, the court can pursue its investigation of the validity of a by-law further than to inquire whether it is "inconsistent with the laws of this State."

The question of the wisdom or expediency of a by-law is quite

foreign to a proper judicial inquiry. The law has wisely left that question to the better judgment of the trustees. A motion was made, at a Special Term held by Mr. Justice PECKHAM, for a preliminary injunction restraining the defendants from acting under by-law No. 11, as adopted November 20, 1884, which was subsequently rescinded, and of which the one of February 27, 1885, is conceded to be substantially a re-enactment. The motion was denied, and the learned judge, in his opinion, says: "The by-law may perhaps be no more than the due exercise of the power of internal administration, and if so it rests necessarily with the majority of the shareholders, *and so long as they* act with good faith and *do not go beyond the capacities of the corporation, as fixed by its charter, the minority must submit. The courts do not interfere unless the corporation, or a majority, may be about to do some act outside of the scope of its or their authority, or in disobedience to its charter.* Otherwise, as I have said, the position of the minority of the shareholders must be that of submission." It cannot be doubted that this by-law is what the judge there aptly characterizes as "a most extraordinary enactment."

The powers delegated by it to the general manager are many and broad, but the question to be determined is whether the delegation of such powers was within "the scope of their authority."

The doctrine of a by-law being void because unreasonable, as applied when an attempt has been made to enforce it against a third person, has no application to a question of delegation of authority under the statute, and I think that no case can be found where a delegation of power has been held to be invalid because it was deemed to be unreasonable. The object and effect of this by-law was to create an agency in the general manager, and the only question for the consideration of the court is whether the authority with which he is clothed is such as the board has power to confer. A board of trustees cannot carry on the business of the corporation except through the instrumentality of agents of its appointment. It is true that the law has confided to the board the management of the affairs of the corporation, but it is not a relinquishment of such management to confer their power and authority on agents who are subject to their control; and I am of opinion that the board does not act outside of the scope of its authority when it delegates to its agents power to

perform any acts which the board itself can legally perform. This doctrine is expressed and illustrated in *Hoyt* v. *Thompson's Exr.* (19 N. Y. 216), where the court, by Judge COMSTOCK, says: "The board of directors of a corporation do not stand in the same relation to the corporate body which a private agent holds toward his principal. In the strict relation of principal and agent all the authority of the latter is derived by delegation from the former, and if the power of substitution is not conferred in the appointment it cannot exist at all. But in corporate bodies the powers of the board of directors are, in a very important sense, original and undelegated. The stockholders do not confer, nor can they revoke those powers. They are derivative only in the sense of being received from the State in the act of incorporation. The directors convened as a board are the primary possessors of all the powers which the charter confers, and, like private principals, *they may delegate to agents of their own appointment the performance of any acts which they themselves can perform.* The recognition of this principle is absolutely necessary in the affairs of every corporation whose powers are vested in a board of directors. Without it the most ordinary business could not be carried on, and the corporate powers could not be executed."

In that case the validity of an assignment of a bond and mortgage of $60,000, which had been executed to the Morris Canal and Banking Company, was questioned on the ground that it was without the authority of the board of directors. The charter fixed the number of directors at twenty-three, and *declared that the corporate powers of the company should be exercised by the board.* Authority was given to establish such by-laws, ordinances, and regulations as should be deemed necessary or convenient for the transaction of its business. One of the by-laws adopted provided that five directors, including the president, should form a quorum for the transaction of the ordinary business of the company. An agreement was made with the State of Michigan, among other things, providing for a transfer to it by the corporation of between $500,000 and $600,000 of securities, including the bond and mortgage in question, and said agreement was executed, and the bond and mortgage assigned in pursuance of a resolution passed at a meeting of five directors and the president. The court says: "The first inquiry suggested by the facts stated is whether the by-law of the company authorizing a

quorum of five directors, including the president, to transact ordinary business, was a valid negotiation.* We are clearly of opinion that it was. The charter of the company, it is true, declared that its powers should be exercised by a board of twenty-three directors, and it may well be conceded that in the absence of any different regulation, a majority of the whole number would be necessary to constitute a legal quorum for the transaction of any business whatever. But it would be a very extraordinary construction of the charter in this respect to hold that the board of twenty-three directors, or a majority thereof, must meet and act whenever any corporate power was to be exercised, and that no delegation of authority could be made to subordinate agents, to committees, or to a quorum consisting of a smaller number."

The court then proceeds in the language which I have first above quoted, to say that the powers of a board of directors are not derived from the stockholders, "and, like private principals, they may delegate to agents of their own appointment the performance of any acts which they themselves can perform." It rests its decision that the by-law was valid on the doctrine of the power to delegate authority. It says of the by-law: "It was, in substance and effect, a regulation which constituted a subordinate agency to conduct the ordinary business of the corporation." To the distinction made by plaintiff's counsel, that the by-law there held to be valid delegated the power to transact only the "ordinary" business of the corporation, I think it an answer that the court, in considering that question, says: "The ordinary business of the corporation had, I think, no limit short of the varied and extensive affairs in which it was authorized by its charter to engage." The court below gives the same construction to the words "ordinary business." (*Hoyt* v. *Shelden*, 3 Bosw. 290.)

In *Palmer* v. *Yates* (3 Sandf. 137) the North American Trust and Banking Company, in pursuance of a statute which authorized it to make such by-laws for the management of its business as it might think expedient, adopted by-laws whereby the entire business which it was authorized to transact was divided into two departments, and a committee was appointed for each department with

* Regulation — [REP.

exclusive charge of that department, with all the powers of the board, and the by-law was held to be valid. Tested by these principles, it seems to me very clear that in enacting the by-law in question, the board of trustees were acting within the scope of their authority. The first clause gives to the manager the general management of the works and of the business of the company, while the following clauses contain specifications of what is intended to be embraced within the first. I think it would be impossible to point out, and plaintiff's counsel have not attempted to *do* so, a specific thing contained therein which the trustees could not authorize an agent to do. The by-law has been assailed because it confers so many and so important powers on a single person, but I think that is a question of expediency and not of legality. If, by a resolution, the board could authorize the general manager to do any one of these acts at a particular time, a proposition which no one could well deny, could it not by a resolution or by-law authorize him to do that act at all times? And if it may authorize him to do one of the specific acts therein mentioned at all times, may it not authorize him to do all of them, at all times, so long as they are all acts whose performance the board can delegate to an agent? If the present board of five members should rescind the obnoxious by-law and adopt one whereby all the powers now delegated to the general manager were distributed among the five members, or among five agents appointed by the board, I think no one would claim that the by-law was void. But if it may legally delegate these powers to five I see no reason why it may not just as legally confer them upon one. The distribution of the powers might be deemed to be wiser, but, as I have said, the question is not whether the by-law is one that a court of equity would make, but whether it is one which the trustees, in the exercise of the discretion vested in them, had the power to make, and if so the court should not interfere.

The plaintiff also asks for a judgment of the court directing that the Woodside houses and grounds and the adjoining farm, together with the stocks in other corporations held by the Burden Iron Company, be withdrawn from and taken out of the assets and property of the corporation and that a division thereof be made between the plaintiff and the defendant James A. Burden. The ground for this relief is, that this is property which the corporation was not

authorized to acquire and hold. Assuming this ground to be correct, I have not been referred by the learned counsel for the plaintiff to any authority, and I am satisfied from my examination that none exists, which authorizes a court of equity for such reason, at the instance of a stockholder, to take the property from the corporate assets and divide it among the stockholders. I think it well settled that a conveyance to a corporation of property which it is incompetent by its charter to take is not void, but voidable only, and the State alone can object.

The conveyance vested the legal title in the corporation and the sovereign alone can divest it. Furthermore, the granting of the request would be in violation of the doctrine that courts will not afford relief to a stockholder against the unauthorized acts of a corporation to which he has consented and in which he has participated. All of this property, of the value of at least $700,000, originally belonged to the plaintiff and to the defendant Burden, equally, as partners. It is not denied that when negotiations for organizing the corporation were pending the defendant Burden insisted as one of the conditions that this property should be transferred to the corporation; that the plaintiff yielded his assent and united with his brother in transferring this, together with all their other partnership assets, to the corporation, for which the plaintiff received and still retains his agreed proportion of the capital stock. The plaintiff cannot now be heard to object that the contract and performance were not within the legitimate powers of the corporation without a palpable violation of a plain principle of equity. To the suggestion that the property may be divided as profits, it is sufficient to say that it is capital and not profits, and furthermore profits can be divided in the form of dividends only, the time, amount and kind of which are within the discretion of the board of trustees.

But while the court has no power to withdraw the real estate from the corporate assets, it has the power, and I think it is its duty, to enjoin the further diversion of the corporate funds thereof on what is known herein as "fancy farming." The testimony shows that since the corporation was organized a very large amount of money out of the treasury has been expended on the Woodside farm in the maintaining of conservatories, the cultivation of plants and flowers and the raising of blooded stock. This was begun while the brothers

were partners, and was carried on for the gratification of the tastes of both and with their mutual consent. It was continued under the corporation, and, for about a year, with the consent or at least with the acquiescence, of the plaintiff, when he began to manifest his disapprobation, and he has since that time orally, by letter, and by resolution protested against the further expenditure of the corporate funds for this purpose. On July 19, 1883, at a meeting of the board of trustees at which all the members were present, he offered the following resolution :

"*Resolved*, That it is inexpedient for this company to continue the business and attending expense of what is known as fancy farming, as heretofore carried on before the formation of this company, and that it be discontinued altogether from and after this date."

He urged the board to entertain and adopt this resolution and it refused. The business was still being carried on and the expenses defrayed from the treasury of the corporation when the action was commenced, and this is the cause of action set forth in paragraph 17 of the complaint, and to restrain the continuance of these acts is part of the relief demanded. That this is an illegal diversion of the funds of the company is conceded.

So long as the stockholders consented there was no substantial objection to these brothers gratifying their tastes at the expense of the company, but as soon as either of them dissented it was the legal duty of the corporation to immediately cease the practice. There can be no doubt that under the co-partnership, and for some time under the corporation, this practice was as acceptable to the plaintiff as to his brother, but there came a time when he chose to dissent. His motives for doing so have been criticised, but it is the duty of the court to determine the various questions in this case not on those ethical principles which should control the conduct of brothers, but according to the rules of law applicable to corporations. The plaintiff has a legal right to object, and he exercised that right. It is true that after the intimation of the court, in its opinion on the motion for a temporary injunction, there was a cessation of this practice and it has not been resumed; but I do not think this furnishes an adequate reason for not enjoining its continuance or resumption.

When the plaintiff offered before the board his resolution for its

discontinuance and urged its adoption it was unquestionably its duty to adopt it. But it refused and the practice was in existence when the action was commenced, and I can conceive of no sufficient reason why the plaintiff should not now be secured in his rights, and not be left to another application for an injunction in case of a resumption of the practice. I am of opinion that upon the proofs now before the court, within the decision of Judge PECKHAM, as well as upon principle, the plaintiff has a clear right to this relief, the form of which will be determined on the settlement of the judgment. On the other causes of action contained in the complaint the defendants are entitled to judgment.